In the Matter of the Complaint of Stanton L. **DIEHL** and Betty Ann Diehl, Owners of a 1973 Clark sailboat, for Exoneration from or Limitation of Liability.

PACIFIC POWER & LIGHT COMPANY, a Maine corporation, Plaintiff,

v.

Stanton L. **DIEHL**, the Estate of Steven N. Diehl, and Clark Boat Co., a Washington corporation, Defendants.

Civ. No. 83–3032.

United States District Court,
D. Idaho.

June 6, 1985.

Jack S. Gjording, Elam, Burke, Evans, Boyd & Koontz, Boise, Id., for plaintiff.

Brian K. Julian, Quane, Smith, Howard & Hull, Boise, Id., for defendants Diehl.

Christopher Burke, Howard Humphrey, Clemons, Cosho & Humphrey, P.A., Boise, Id., for defendant Clark Boat Co.

## MEMORANDUM OPINION

RYAN, District Judge.

This matter is before the court on Defendant Clark Boat Company's (Clark) Motion for Summary Judgment. The parties have fully briefed the issues raised by Clark's motion. The court entertained oral argument and, having taken the matter under review, has had an opportunity to thoroughly review the memoranda and arguments of counsel. For the reasons set forth below, the court finds that Clark's

Motion for Summary Judgment should be granted.

## FACTS

The operative facts in this matter as they relate to Clark's motion are undisputed. On the evening of September 4, 1982, Steven and Jonie Diehl, Mark and Kathy Heumann, and William and Kathryn Yost were sailing a San Juan 21 sailboat manufactured by Clark on Lake Pend Oreille, a navigable body of water located in North Idaho. The sailboat was owned by Stanton L. Diehl, Steve Diehl's father. As the evening's excursion drew to a close, the craft with its occupants returned to dock at Steve Diehl's slip. For reasons unimportant to the present motion, it was determined that the sailboat should be docked at a neighboring slip. En route to this destination, the mast of the sailboat came in contact with a high-voltage power line in an area of the lake known as Shaw Bay. The mast of the San Juan consisted of an aluminum pole supported by stainless steel stays. Aluminum masts began to be used by sailboat manufacturers in the early 1960's, and became the "standard" for the industry by 1970. The San Juan which is the subject of this suit was manufactured in 1973. The power line involved was owned and operated by Pacific Power and Light Company (PP & L) and was strung approximately 25 feet above the surface of the water. As a result of the collision with the power line, an explosion and/or fire erupted on board the sailboat, causing it to burn and eventually sink in the bay. Five of the six persons on board perished. Kathy Heumann was the sole survivor. Following these tragic events, PP & L settled claims with the heirs of the deceased.

Subsequently, Stanton Diehl, the owner of the sailboat, instigated this action seeking protection and exoneration from liability under 46 U.S.C. § 183. PP & L answered Stanton Diehl's Complaint and filed a counterclaim. In addition, PP & L filed its own Complaint naming the Estate of Steven Diehl (Estate) and Clark. In PP & L's Complaint against Clark, PP & L seeks contribution from Clark for part of the settlement proceeds paid by PP & L to the heirs of the deceased. In support of its claim for contribution, PP & L alleges that Clark was negligent in the design of the San Juan 21 and that the sailboat was defective and unreasonably dangerous in various particulars. Clark has moved for summary judgment maintaining that it was not negligent in the design of the sailboat and that the sailboat was not unreasonably dangerous.

## ISSUES PRESENTED

The issues raised by Clark's motion are as follows:

(1) Was the San Juan 21 sailboat defective and unreasonably dangerous due to (a) its failure to include an insulating feature in its mast designed to avoid electrical shock, or (b) its failure to include a warning on its mast designed to apprise users of the dangers posed by high-voltage overhead power lines?

(2) Was Clark negligent in its design of the San Juan 21 for (a) failing to insulate the mast to avoid electrical shock, or (b) failing to warn purchasers of the dangers posed by high-voltage overhead power lines? The court notes that the concerns raised by the first ISSUE PRESENTED focus on the condition of the product following the manufacturing process, whereas the concerns raised by the second ISSUE PRESENTED focus on the conduct and behavior of the manufacturer.

(3) The court raises a third issue of its own volition concerning whether considerations of public policy prohibit PP & L from seeking contribution or reducing its liability for injuries caused, in the most part, by its failure to properly locate, maintain, and monitor its high-voltage power lines. This concern is particularly relevant in this case since the power line in question was located in an area where PP & L was fairly charged with the knowledge that sailboats were present and that its line posed a significant hazard to the users of those boats.

## ANALYSIS

### Standard of Review

■ Initially, the court notes that under Rule 56, Clark's Motion for Summary Judgment should be granted only where there are no material issues of fact in dispute and where Clark is entitled to judgment as a matter of law. In this case, Clark admits that the mast of the sailboat was not insulated and that there was no warning attached to the mast advising of the danger posed by overhead power lines. These facts are not in dispute. Nevertheless, Clark maintains that, even given these facts, the court should hold as a matter of law that Clark was not negligent in its design of the sailboat and that the sailboat was not in an unreasonably dangerous or defective condition following manufacture. The determination of negligence or whether a product is unreasonably dangerous or defective is generally left to the trier of fact. However, where the facts are undisputed and only one conclusion may reasonably be drawn from them, these determinations become questions of law. *Flying Diamond Corp. v. Pennaluna & Co., Inc.,* 586 F.2d 707, 713 (9th Cir.1978); *Lutz v. United States,* 685 F.2d 1178, 1185 (9th Cir.1982). In appropriate cases, the court must rule as a matter of law on these issues relating to negligence or product defect. The present is such a case.

### Strict Products Liability

■ The Ninth Circuit has adopted for use in maritime tort cases the doctrine of strict products liability as expressed in the Restatement (Second) of Torts § 402–A (1965). *See Pan-Alaska, Etc. v. Marine Construction & Design Co.,* 565 F.2d 1129 (9th Cir.1977). Section 402–A provides in pertinent part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property. . . .

PP & L alleges the San Juan sailboat was unreasonably dangerous and thereby defective based on two design characteristics of the sailboat. First, PP & L argues that the mast failed to incorporate any insulating feature designed to prevent the conduction of electricity. Second, PP & L alleges that the sailboat was unreasonably dangerous because its design did not include a warning on its mast identifying the dangers posed by overhead power lines.

■ Comment *g* to Section 402–A defines "defective condition." That comment states:

The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

According to Comment *g,* a product is "defective" when it is in a condition not contemplated by the consumer which makes the product "unreasonably dangerous." Thus, an "unreasonably dangerous" product is a "defective" product. However, a product that poses dangers in its contemplated condition may not be unreasonably dangerous. Comment *i,* which defines "unreasonably dangerous," recognizes this possibility. That comment states:

The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. . . . The article sold must be *dangerous to an extent beyond that which would be contemplated by the ordinary consumer* who purchases it, with the ordinary knowledge common to the community as to its characteristics.

(emphasis added) Comment *j* recognizes that in some cases the seller may be required to give directions or warnings in order to prevent his product from being deemed "unreasonably dangerous." However, the comment recognizes that a seller "is not required to warn with respect to products . . . when the danger, or potentiality of danger, is generally known and recognized." Where the danger posed is obvious and known objectively, a failure to

warn of the dangers does not render the product defective.

██ A fair reading of Section 402–A and its comments reveals that open and obvious dangers inherent in some products do not necessarily make them "unreasonably dangerous." Rather, only latent dangers, not reasonably discoverable or not contemplated by consumers, render products defective. In *Coast Catamaran Corp. v. Mann*, 171 Ga.App. 844, 321 S.E.2d 353 (1984), *aff'd*, 326 S.E.2d 436 (1985), the Georgia Court of Appeals was faced with a factually and theoretically similar case. That court applied Georgia's statutes which imposed strict liability upon manufacturers who produced products unsuited for their intended use. The court interpreted the language of the statute as requiring plaintiff to establish that the product was defective when sold by the manufacturer. The Georgia court was, in essence, applying a statutory scheme substantially similar to the provisions of Section 402–A. In *Coast Catamaran*, the appellate court stated:

> Generally, if a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. We have not yet reached the state where a manufacturer is under the duty of making a machine accident proof or foolproof.... [H]e is under no duty to guard against injury from a patent peril or from a source manifestly dangerous.

*Id.*, 321 S.E.2d at 356, *citing Poppell v. Waters*, 126 Ga.App. 385, 387, 190 S.E.2d 815 (1972). In a similar vein, the Ninth Circuit, in applying Idaho law under Section 402–A, held:

> Failure to warn results in liability only in situations where the danger is not obvious to the user, and the manufacturer has reason to believe that the danger might result from the foreseeable use of the product.

*See Bryant v. Technical Research Co.*, 654 F.2d 1337, 1344 (9th Cir.1981).

██ In the present case, as in *Coast Catamaran*, the injuries suffered were caused by an electrical shock which was transmitted down the mast of a sailboat. The court in *Coast Catamaran* determined that the danger posed by the design of the sailboat and the overhead power line was open and obvious. This court concurs in that determination. Indeed, the court finds that the danger posed by the sailboat's mast and power line was so open and obvious that reasonable minds could not conclude that this danger rendered the sailboat unreasonably dangerous or defective. It was patently obvious that the aluminum mast incorporated in the design of the boat could and would readily conduct electricity. There was nothing latent about the danger posed by the uninsulated power lines. Under these circumstances, the court must hold as a matter of law that the San Juan sailboat was not defectively designed due to its failure to incorporate insulating properties within its mast configuration. For the same reasons, the court must find that the sailboat was not unreasonably dangerous or defective due to its failure to incorporate a warning label apprising users of the dangers associated with electric power lines. A product is not unreasonably dangerous for failure to warn of open and obvious dangers.

### Negligence

██ In this case, only semantics distinguishes the cause of action for negligence and the cause of action for strict products liability. As previously indicated, the only significant difference is that negligence focuses on the conduct of the manufacturer, while strict products liability focuses on the condition of the product. The Idaho Supreme Court recognized in *Henderson v. Cominco American, Inc.*, 95 Idaho 690, 518 P.2d 873 (1973), that:

> Whether a cause of action is based on warranty, negligence or strict products liability, the plaintiff has the burden of alleging and proving that (1) he was in-

jured by the product, (2) the injury was the result of a defective or unsafe product, and (3) that a defect existed when the product left the control of the manufacturer. *Id.* at 696, 518 P.2d 873. Under this standard, in order to establish negligence, it must be shown that Clark acted unreasonably in designing the San Juan and that these actions resulted in a defective product. The court has already determined as a matter of law that the San Juan was not defective in any way. Therefore, Clark could not have breached its duty of reasonable care in the design of the sailboat.

### Public Policy Considerations

■ Finally, the court notes with concern the public policy that would be fostered if PP & L prevailed in its quest for contribution from Clark. It has long been established in Idaho that the highest degree of care must be exercised by those engaged in the generation and transmission of electric energy. *Probart v. Idaho Power Co.*, 74 Idaho 119, 258 P.2d 361 (1953). Electricity is recognized as one of the most destructive agencies we have, and the highest degree of care and diligence is required by those who are operating electrical plants in order to avoid injury to person and property. *Russell v. City of Idaho Falls*, 78 Idaho 466, 305 P.2d 740 (1957). Sound public policy demands that PP & L, in operating its transmission lines, exercise the highest degree of care possible. If PP & L is remiss in meeting this grave responsibility, public policy prohibits an outcome which would allow PP & L to escape the total brunt of the liability and resulting economic damage. This is particularly true where PP & L seeks contribution from an alleged joint tort-feasor whose negligence, if any, was merely passive. Assuming *arguendo* that some culpability did lie with Clark, though the court has found to the contrary, that culpability must be characterized as mere passive negligence. If Clark Boat Company was culpable, it was culpable of failing to discover and warn or insulate against an extremely dangerous condition *created and maintained by PP & L.* The fact that the danger posed by the sailboat's design was open and obvious does not transform Clark's hypothetical passive culpability to one of active negligence. PP & L had the better opportunity to prevent this accident. Indeed, had PP & L been exercising the highest duty of care required of it by law, the tragedy of this accident could have been completely avoided.

This outcome is not inconsistent with the court's earlier refusal to grant the Estate's Motion for Summary Judgment. The Estate of Steven Diehl is in a different position. Juxtaposed to Clark's hypothetical passive culpability is the relative fault of Steven Diehl, the owner pro hac vice and skipper of the vessel. Mr. Diehl's actions were more than passive in that he chose to skipper the excursion after dark in an area where he knew or should have known overhead high-voltage power lines were present. Though the court has found that the danger posed by overhead power lines and the design of the sailboat was open and obvious, the ability to avoid the danger thus posed was significantly reduced by Steven Diehl's choice to sail after dark. His choice may in no way be attributed to Clark.

Finally, the court notes that nothing stated in this section in any way diminishes the court's opinion or ruling on the issues relating to Clark's negligence or whether the sailboat was defectively designed. The court merely wishes to add its comments and observations as they relate to what the court perceives as a fundamental public policy consideration lying, ultimately, at the heart of its jurisprudence.

### CONCLUSION

Based on the foregoing, the court finds there are no material facts in dispute relating to the historical facts before the court. Rather, the only issue in dispute is whether the sailboat in question was defective or negligently designed. As indicated, normally those questions are for the trier of fact. However, in this case, the court finds

that reasonable minds could not conclude that the sailboat was unreasonably dangerous or that Clark was negligent in its design of the boat. Based upon this conclusion, the court must, as a matter of law, enter judgment for Clark.

The court notes that PP & L has not alleged any contribution based on the theory that the San Juan was not "crashworthy." Since PP & L has not asserted this theory of recovery, the court will not reach the merits of this theory, if any. The court being fully advised in the premises,

IT IS HEREBY ORDERED that Clark's Motion for Summary Judgment should be, and hereby is, GRANTED IN ALL RESPECTS.

IT IS FURTHER ORDERED that PP & L's Complaint for contribution from Clark should be, and hereby is, DISMISSED.